SARTAIN, Judge.
In this litigation the plaintiffs appeal from a judgment rejecting their demands to have their respective properties stricken from an ordinance assessing each the sum of $39.31 per front foot as their prorata share of the costs incidental to street improvements.
The trial judge, in his written reasons for judgment, concluded that plaintiffs’ petition was untimely filed and sustained defendants’ [1] peremptory exception of prescription. The judge a quo, arguendo, went on to determine on the merits that defendants had not acted arbitrarily and capriciously in the enactment of the ordinance and declined the relief sought. We reverse.
The statutes relating to the improvement of public streets are found in Title 33, Sections 3301 through 3319. Section 3301 vests in the governing body general authority to construct street improvements including necessary curbing, guttering, etc. Section 3302 requires the municipality to first adopt a resolution signifying its intention to make the proposed improvements and to conduct an open hearing so that objections may be made not only as to the improvements but also as to the manner of paying for them. Section 3303 requires that after having conducted the hearing, disposing of objections, and having decided to proceed with the project, the municipality may cause to be prepared necessary plans and specifications. Pursuant to this section the municipality is authorized to adopt a resolution calling for sealed bids. Section 3304 relates to the awarding of the contract. Section 3305 provides that upon the awarding of the contract for the improvements the municipality shall require its engineer to furnish it a certified statement showing the total cost including the amount chargeable to each abutting lot. Section 3306(B) provides that upon receipt of the engineer’s report each property owner shall be mailed a notice stating the general improvements and the amount of his proposed assessment.
EXCEPTION OF PRESCRIPTION
On this issue we are concerned with Resolution No. 10,413 and Ordinance No. 4047. Resolution 10,413 relates to the acceptance of the engineer’s report and the fixing of the total assessment at fifty percent of the cost of the improvements. Ordinance No. 4047 is the assessment ordinance itself. The dates pertinent to the question of prescription are as follows: On March 14,1973, following a public hearing, the Parish Council adopted Resolution 10,274, ordering the improvement of North Street. This resolution was published on May 9, 1973. Also, on May 9, 1973, the Council received the engineer’s report (Section 3305) and adopted Resolution No. 10,413. On May 21,1973, notices were mailed to the affected property owners. (Section 3306[B]). On June 27, 1973, Assessment Ordinance No. 4047 was adopted levying the presently contested assessment. The minutes of the May 9, 1973 meeting were not published until July 12, *210 1973. The instant lawsuit was filed on July 17, 1973. Assessment Ordinance No. 4047 was published on September 6, 1973.
R.S. 33:3319 in pertinent part, states:
“No contest or proceeding to question the validity or legality of any resolutions or ordinances adopted or proceedings had under the provisions of this Sub-part shall be begun in any court by any person for any cause whatsoever, after the expiration of thirty days from the date when the resolution, ordinance or proceeding was published, and after such time the regularity of such resolution, ordinance or proceeding shall be conclusively presumed. * * * ” (Emphasis ours)
Defendants argue that prescription began to run on May 9, 1973, the date Resolution No. 10,274 was published. Plaintiffs, on the other hand, contend that they are not contesting the authority of the Council to order the improvements. To the contrary, they are contesting Resolution No. 10,413 and Ordinance No. 4047, and only seek to have their lots deleted from the latter. Accordingly, they contend that the running of prescription should be determined by reference to the publication of the subject resolution on July 12, 1973 and the publication of Ordinance No. 4047 on September 6, 1973.
We find the contention of defendants to be without merit. The resolution (10,274) they argue that tolls the running of prescription is not one of the acts of the Parish Council complained of here.
We also find that the trial judge erred in commencing the running of the thirty day period on May 21, 1973, the date notice was mailed to the property owners advising them of the proposed assessment. R.S. 33:3319, above, by its specific terms, affords a property owner thirty days from the date the resolution (10,413) or ordinance (4047) sought to be contested is “published.”
ON THE MERITS
Formerly, North Street was a typical, 2-lane asphalt street, bordered by sidewalks, street lights, and underground drainage. With the improvements it became a 4-lane, concrete thoroughfare bordered by wide sidewalks, underground conduits for street lighting, larger water mains, improved drainage, and tree wells for planting. Plaintiffs urge that these improvements were made in conformity with a program to update the whole of the downtown district of Baton Rouge for the general public. They assert that the Parish Council’s failure to adhere to the specific requirement of R.S. 33:3306(A) resulted in excessive assessments against their properties which caused them to bear a disproportionate share of the cost of improvements. In this regard their complaints are twofold: (1) That Resolution 10,413 is defective for the reason that the engineer’s report did not contain a detailed list of the property to be assessed; and (2) that Resolution 10,413 and Ordinance 4047 are defective because the Parish Council did not follow the dictates of R.S. 33:3306(A) by failing to determine whether “each lot or parcel of real estate to be assessed will be benefited to an amount not less than the proposed local or special assessment.”
With respect to the first contention, above, we find that the record discloses ample evidence upon which to support a conclusion that the engineer’s report did contain a list of the abutting properties with sufficient descriptions to identify the same and the owners thereof.
However, we do find that plaintiffs’ second contention (above) has considerable merit.
R.S. 33:3306(A), inter alia, provides:
“A. Upon receipt of the certified statement or report of the engineer as provided for in the preceding section, the governing authority shall review said certified statement or report, including the proposed local or special assessments, and thereafter shall make a determination as to whether each lot or parcel of real estate to be assessed will be benefited to an amount not less than the proposed local or special assessment. * * * ”
(Emphasis ours)
*211 By way of information we should note that R.S. 33:3306 was amended by Act 552 of 1970. Before this amendment the statute permitted the levying of a special assessment on property “in proportion that its frontage bears to all the abutting lots or parcels of real estate to be improved . . ” It was referred to as the “front foot” rule.
Under this section, prior to amendment in 1970, numerous cases attest to the fact that the total burden of street improvements could be placed on the abutting property owners. Donaldson’s Heirs v. City of New Orleans, 166 La. 1059, 118 So. 134 (1928). The only requirement was that the assessment must be in proportion to the total frontage. City of Shreveport v. Weiner, 134 La. 800, 64 So. 718 (1914). It was not necessary that there be any special benefit to the owner. City of Shreveport v. Shreveport Traction Co., 134 La. 568, 64 So. 414 (1914). Nor did it matter that the amount of the assessment exceeded the, value of the property. The imposition of such an assessment based exclusively on a front-foot basis and without inquiry as to benefits did not constitute a taking of property without due process of law. Donaldson’s Heirs v. City of New Orleans, above.
Thus, it can be readily seen that the 1970 amendment to R.S. 33:3306, with the requirement that each lot or parcel of land abutting the improvements be benefited to an amount not less than the proposed assessment, brought about the very significant change in a municipality’s authority to assess for street improvements.
Resolution No. 10,413, adopted on May 9, 1973, recites in Section 2:
“Upon receipt of the foregoing certified statement or report of the Engineer as provided for in R.S. 33:3305, this Parish Council did review said certified statement or report, including the proposed local or special assessments, and does hereby find and determine that each lot or parcel of real estate to be assessed is to be benefitted to an amount not less than the proposed local or special assessment. In making said investigation, finding, and determination this Council has found to the best of its knowledge, information, and belief that each proposed assessment is true and correct and that the property to be assessed in each instance is benefit-ted to an amount not less than the proposed local or special assessment therefor.”
This particular resolution forms the basis for Assessment Ordinance 4047. In the resolution the initial assessment was fixed at $42.15 per front foot. This initial assessment was reduced to $39.31 per front foot as a result of the liquidation of a contingency reserve included in the construction cost. The assessment ordinance reflects this change.
It is well settled that municipal legislative acts are presumed to be valid and the burden rests with the party who asserts the contrary. A court may not interfere with this legislative function unless it is clearly shown that the legislative body’s action is so clearly arbitrary and capricious as to be unreasonable. Olsen v. City of Baton Rouge, 247 So.2d 889 (1st La.App.1971), writs refused, 259 La. 755, 252 So.2d 454 (1971).
Equally well settled, however, is the rule that statutes conferring upon municipalities the authority to impose local or special assessments are in derogation of common rights and must be strictly construed. Bell v. City of Shreveport, 234 La. 607, 100 So.2d 883 (1958); Barber Asphalt Paving Co. v. Watt, 51 La.Ann. 1345, 26 So. 70 (1899); and, Gamburg v. City of Alexandria, 85 So.2d 276 (2nd La.App.1956).
Resolution 10,413 and Ordinance 4047 specifically state that the Parish Council made the required determination. Words to this effect, however, do not necessarily make it so. The presumption is that such a determination was made. The question is whether plaintiffs have borne the burden of proving the contrary.
Plaintiffs’ witnesses testified that they were in attendance at the May 9, 1973 meeting and that no discussion was had relative to any individual lot or the benefits thereto; but to the contrary, the Engineer’s *212 report was accepted as a routine matter and without discussion.
Defendants argue that the resolution speaks for itself and represents the collective views of the individual members of the Parish Council. They contend that the matter of improving North Street was under consideration and subject to numerous public hearings for years prior to 1973 and that whereas no particular emphasis was placed on any particular lot, the subject itself, including benefits in general to the abutting property owners, was very much in the minds of the Council members and received every consideration.
On the question of benefits, plaintiffs’ evidence is to the effect that North Street prior to the improvements, including its sidewalks, drainage and lighting, was satisfactory in every respect. They further offered the testimony of a real estate appraiser who opined that the improvements add no value to their property.
Defendants’ testimony, as expected,' is to the contrary. Improved drainage was attested to by the Director of Public Works for the City of Baton Rouge and Parish of East Baton Rouge. Benefits derived from added fire protection because of enlarged water mains were described by the Fire Chief. The Chief of Police stated that improved lighting enhanced police protection and was a deterrent to crime. Admittedly, these views on fire and police benefits were not given to the Council on May 9, 1973.
Mr. Ray Burgess, Director of Public Works, testified that on numerous occasions he discussed with the members of the Council the benefits to be derived from and the necessity for the noted improvements.
Mayor-President Woodrow W. Dumas testified that the improvement of the streets, including North Street, in the central business district of Baton Rouge, revitalized the entire area.
The Parish Council is composed of twelve members. The minutes reflect that the subject resolution and ordinance were unanimously adopted. Only two members of the Council were called to testify and they by the plaintiffs.
Councilman W. T. Winfield testified, in part, as follows:
“THE COURT: The question was, does he remember whether or not there was evidence presented to the Council in regard to the special benefits to the pieces of property. And it will just require right now a yes or no answer.
BY MR. BREAZEALE:
Q. At the May 9th, 1973 meeting.
A. I can’t answer that with a yes or no answer.
THE COURT: Well, you may try and then explain.your answer.
A. Okay, we had a capital improvements committee meeting where evidence or presentations was made in behalf of the changing of the lanes on the street. At that time I was at that meeting although I don’t serve as a member of that committee. The evidence that was presented at that time to my knowledge and memory was that in planning for the future, the four laneing of North Street would be to the benefit of the public. In addition to that particular point, another piece of evidence was presented, and I’m not certain Your Honor whether it was presented at the committee meeting or the Council meeting, was that the exit on the North Street, or the North Street exit, or for the expressway would be redone by the State Department of Highways, as another means of proving that that street needed four lane-ing. By Council meeting, I had a letter in my presence that was from Mr. W. T. Taylor, who is the head of the Department of Highways, which stated in fact that there was no plans in the future and nor did they feel that they would ever demand this because of traffic. That’s about as fair as I can answer it. To say that the evidence that was presented was not evidence, that would generate to me the benefit of the public, due to *213 the fact that the only ones was the State Department plans and the traffic plans for the future. Which I argued that these traffic plans or evidence of future demand for traffic on that avenue at that time was done by a land use study that was done previous, several years back and the growth anticipated, yearly growth of traffic on that artery had not justified us going into it with an increase of laneing.
Q. In other words, you had evidence that four laneing the street was in the general public interest; is that correct, sir?
A. Right.
Q. And did you have any evidence before you when this report was received and the resolution adopted on May 9th, 1973, any evidence as to special benefits to the property owners on North Street between 5th and 9th Street?
A. No, sir.”
Councilman Thomas V. Neck’s testimony can best be summarized by the following quote:
“THE COURT: With that understanding, the question was do you remember what evidence was presented to the Council that caused the Council to vote the adoption of this ordinance in which there was a finding that there was benefit to the local property owners.
THE WITNESS: That’s the question?
THE COURT: Yes, sir.
THE WITNESS: Wéll, it’s not three lanes versus four lanes?
THE COURT: No.
THE WITNESS: It has nothing to do with it, okay. Just from my standpoint, the improvement of the street whether it be three or four lane, I think would benefit the property owners. This would be what I was lead to believe.
THE COURT: Now, that was by—
THE WITNESS: Just general discussion, I think we discussed this issue for, hell, probably ten, twelve months at different various times. And the commercialism of that block or blocks would increase the property values. And the upgrading, which we did this street, the upgrading, the environment, the surroundings and just the social and economic standards that are involved in that area, and that’s all I can answer. The main reason I went with four lanes is because of the new American Bank going downtown. And I thought eventually if we did go three lanes that we’d have to come back and make it four lanes at a later date, and that was the reason I voted the way I did.

MR. KEOGH: Once again, interpose this objection. We are getting into qualitative consideration.
THE COURT: I think so Mr. Breaz-ealé. We are getting into a wide ranging discussion into semantics as to what the principal consideration was or was not. As I say, the evidence that I will consider will be not opinion testimony or anything at all like that. It’s whether or not there was evidence presented to the Council and considered by the Council to form a basis for their finding that there was special benefit.
THE WITNESS: Judge, just let me say, I never did consider any kind of assessments on the property or any of these other things. I just, you know, you want the truth. I just thought that was in the best interest of the public to have it four lanes. I never considered the assessment or who was there or — I know Mr. Jensen moved in on that same street. I’ve done business with him, you know, after all this. I never considered this. What I was considering, what was better and I think the cheapest way at the time to get the best job done was to get it four laned. And I just voted for the general public and I thought in all fairness that was the best use of that area.”
The record reflects that.in 1965 the voters of the Parish of East Baton Rouge approved a capital improvements bond issue. Included in the projects to be under *214 taken were considerable portions of the central business district of Baton Route. As early as March 22,1967,[2] the Parish Council evidenced its intention to apply a portion of these revenues to the improvement of the “downtown area” of Baton Rouge on the basis of Parish participation of fifty percent of the cost with the remaining cost to be borne by the abutting property owners. It published its intention to do so on April 20, 1967.[3] On May 10, 1967 it conducted a public hearing on the matter and adopted a resolution of intent.[4] Subsequent resolutions, similar in purpose to that of March 22, 1967, were adopted.[5] Numerous public hearings were conducted.[6] Most, if not all, of these subsequent resolutions refer to fifty-fifty participation as set forth in the March 22, 1967 resolution.[7] From its earliest date to the institution of this litigation, the Parish Council has never deviated from this policy consideration and throughout the improvement of the entire downtown section of Baton Rouge it has participated to the extent of fifty percent of the cost and has assessed the abutting property owners for the balance on a front-foot basis. May- or Dumas testified that all owners of downtown property were treated equally and assessed in this manner, including plaintiffs.
We think plaintiffs have borne their burden of proof. We do not question the good intentions of the Parish Council in adopting the subject resolution and ordinance. It initiated a program in 1969 to improve the downtown business district of Baton Route at a time when assessments could be imposed without consideration of a cost-benefit ratio. However, Act 552 of 1970 changed the rules. Municipal authority is now limited in that any given assessment cannot be greater than the benefit to be derived. Moreover, the imposing authority is mandated to make this determination. R.S. 33:3306(A), above.
Plaintiffs’ properties are located on the north side of North Street and each is zoned A-4 (multi-family residential). For the purposes of the assessment, proposed and actual, their properties were treated the same as each and every other piece of property located in the central business district of Baton Rouge without regard to its restricted use or otherwise.
Defendants argue that court interference in the instant matter is an infringement upon the legislative authority of the Parish Council. We disagree. This is not a question arising out of the exercise of discretionary authority, i. e., whether to widen or improve a given street. The action taken by the Parish Council in the instant matter is an exercise in the power to assess and this authority must be strictly construed.
There is not one scintilla of evidence in this record that states that any given benefit adds “X” dollars to the value of the properties sought to be assessed so that the sum total of all of the benefits alleged to flow from all of the improvements equal the amount of the assessment. All of the testimony offered by defendants is in general terms. The language found in the resolution and the ordinance that a determination was made is nothing more than a conclusion and does not satisfy the mandate of the statute.
Defendants ask that we not require separate before-and-after appraisals of each lot to justify the imposition of an assessment as such requirement would be an unreasonable and costly burden on the public authority. We do not propose to do so. We do, however, state that the legislature did not presume that the composition of our public authorities would consist primarily of *215 members expert in the field of real estate values. Under the statute the governing authority is required to make a “determination” and in this respect to perform a quasi-judicial function. What evidence or information as to the value of benefits a governing authority considers in making this determination should be left to the authority. So long as such information is reasonable and serves as a sound basis upon which an assessment can be imposed, it will be held to satisfy the requirements of the statute.
Defendants cite Butaud v. City of Lake Charles, 338 So.2d 358 (3rd La.App., 1976), as presenting facts similar to those in the case at bar. For emphasis, we quote that court’s finding of fact:
“The expert appraiser employed by the City Council to determine the extent of benefits from the paving projects estimated that amount to be $28.50 per front foot. He announced this finding at the March 20, 1974 meeting of the Lake .Charles City Council. Acting on the basis of this estimate, and-after consulting various department heads and other advis-ors, and listening to plaintiffs’ objections, four of the seven City Councilmen voted for acceptance of the ordinance declaring that the benefit to the assessed property exceeded the amount of the proposed paving assessment. At a subsequent meeting, five of Lake Charles’ seven City Councilmen voted in favor of the ordinance actually levying an assessment of $35 per front foot.
“Each of the four councilmen who voted in favor of the ordinance accepting the. engineer’s report knew of the statutory requirement that paving assessments not exceed the amount of benefit to the assessed property. Each of the four councilmen testified that he discussed the matter of the paving assessment with various city department heads, or other advisors. Each of these four councilmen was asked the pivotal question of whether he thought the property abutting the Prien Lake Road improvement was benefited to the extent of $35 per front foot. Each answered affirmatively. (Emphasis ours)
“The record as a whole shows the Council considered the matter carefully over a period of several months. There was ample evidence that plaintiffs’ properties were benefited substantially. Essentially, the issue before the Council was whether the benefit was as much as $35 per front foot. Mr. Coleman, the appraiser employed by the Council, estimated the benefit as ‘at least’ $28.50. This is so close to the figure of $35 approved by the Council that we, as a court reviewing a legislative determination, cannot say the Council acted arbitrarily on this basis.”
Further, we note that the court felt compelled to negate the “going-rate” approach to assessment practice.
The facts in the instant case are quite different from those found in Butaud, above. Here, there was no appraisal or similar information furnished the Parish Council. As stated above, there is not one single statement in this record that the members of the Parish Council were given any dollar value as to benefits. Most importantly, there is not one single statement in this record to indicate that the Parish Council deviated one iota from the policy that it announced in 1967 to assess property owners fifty percent of the cost of improvements. To the contrary, the entire tenor of the evidence and, more particularly, the argument and brief of counsel for defendants is to the effect that this policy of fifty percent participation was fair and equitable. It may well be fair and equitable but it begs the crucial question of whether the properties have been benefited to an amount not less than the assessment.
Because Ordinance 4047 will form the basis for the issuance of municipal bonds, we feel compelled to state that the validity of the ordinance is not impaired. Plaintiffs do not seek to have the ordinance so declared. They seek only to have their individual assessments stricken therefrom. We limit our ruling herein to this effect.
Accordingly, for the above and foregoing reasons, the judgment of the district court is reversed and judgment is rendered herein *216 in favor of the plaintiffs and against the defendants decreeing that the properties of the plaintiffs be and are hereby stricken from “LOCAL OR SPECIAL ASSESSMENT ORDINANCE NO. 4047 OF THE PARISH OF EAST BATON ROUGE, LOUISIANA, FOR THE YEAR 1973.” (Adopted June 27, 1973). Said assessments are more particularly described and shown thereon as Assessment Numbers Fifteen (15), Sixteen (16), Seventeen (17), Nineteen (19), Twenty-five (25), Twenty-six (26), Thirty (30), Thirty-one (31) and Sixty-one (61). All such costs as are permitted by law are assessed against the defendants.
REVERSED AND RENDERED.

. The defendants are the Parish Council of the City of Baton Rouge and Parish of East Baton Rouge, the Mayor-President, and the individual members of the Council.

. Parish Resolution 7093.

. Parish Resolution 7112.

. Parish Resolution 7140.

. Parish Resolution 7149 (May 10, 1971); 9348 (May 26, 1971); 10,237 (February 14, 1973); and, 10,274 (March 14, 1973).

. May 10, 1967; June 23, 1971; and March 14, 1973.

. See footnote 3, above.